UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JIMMY MASON. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:09-CV-1081 CAS |
| ) | |
| SAFECO INSURANCE COMPANY OF ) | |
| AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Safeco Insurance Company of America's ("Safeco") motion to limit or exclude the testimony of plaintiff's expert witness, Thomas P. Wellington, regarding mold contamination of plaintiff's boat. Safeco asserts that Mr. Wellington's testimony as to causation does not meet the standards for admissibility set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Plaintiff opposes the motion. No party has requested an evidentiary hearing. The parties have submitted an evidentiary record which includes Mr. Wellington's expert report and deposition testimony and the report and deposition testimony of defendant's expert. Accordingly, the Court finds that it can make a proper Daubert analysis without the need for an evidentiary hearing or oral argument.

**Background**

Plaintiff owns a Sea Ray XM boat ("Sea Ray"), which is insured by Safeco. The Sea Ray was involved in a two-boat collision on the Lake of the Ozarks on August 23, 2003. In the collision, the Sea Ray's hull was punctured and the boat took on approximately eighteen to twenty inches of water in the cabin. Plaintiff reported the accident to his insurance agent on or about August 25,

2003. On September 8, 2003, plaintiff advised Safeco that the Sea Ray had been moved to Four Seasons Marina in Lake Ozarks for a repair estimate. Four Seasons estimated repairs to the Sea Ray would cost $38,375.58, and plaintiff passed this information on to Safeco. Plaintiff also advised Safeco that after the accident he had the boat drained of water and the cabin cleaned and debris removed. On September 23, 2003, plaintiff advised Safeco that he was uncertain whether he intended to repair the Sea Ray and planned to move it to dry storage, but asked Safeco to issue a check payable to him for the cost of repairs. On approximately October 7, 2003, Safeco issued a check to plaintiff for $38,100.56. In January 2004, plaintiff contracted with Larry's Professional Marine to perform repairs to the Sea Ray, and in June 2004 advised Safeco that the repairs had been completed but the Sea Ray's carpet could not be cleaned. Safeco issued a second check to plaintiff for $2,662.36 for carpet replacement.

At some point in the spring or summer of 2004, plaintiff notified Safeco that he suspected there was mold on the boat. Plaintiff made several unsuccessful attempts to communicate with Safeco between November 2004 and February 2005. Plaintiff filed this action in state court on August 21, 2008.[1] In March 2009, Safeco requested an inspection of the Sea Ray for possible mold contamination, and the inspection took place on May 22, 2009. The Sea Ray was inspected by Jesse Flaugher of Safeco and Doug Beck of Lake Ozark Environmental. On May 29, 2009, Mr. Beck sent a report to Mr. Flaugher indicating the presence of some surface mold in the boat. The report also made several recommendations to reduce the presence of mold, including that the mold be cleaned and the boat's humidity lowered.

---

[1] Safeco was not served with summons and complaint in state court until June 10, 2009. Safeco subsequently removed the action to this Court based on diversity of citizenship. See 28 U.S.C. § 1332(a).

Plaintiff identified Thomas Wellington as an expert on the issue of mold contamination. In an initial report dated January 10, 2010, Mr. Wellington opined that mold is growing in the interstitial spaces between the hull of the boat and the interior cabin finishes as a result of the 2003 accident. In forming his opinion, Mr. Wellington relied on the Lake Ozark Environmental report prepared by Mr. Beck, a "Report of Marine Survey" valuation report by William Finnegan, and an accident investigation report by the Missouri State Water Patrol. After Mr. Wellington prepared his expert report, he inspected the boat and observed that it smelled moldy. Mr. Wellington testified that he inspected the Sea Ray "basically to understand the skeleton of the boat" and did not look for any water damage or conduct any testing during the inspection.

On February 16, 2010, Safeco's expert Roman Narconis, Jr. conducted a series of swab and air tests in the Sea Ray's cabin which showed high mold counts in the boat's interior, and Mr. Narconis located mold in several locations within the cabin and identified high mold counts in the cabin air.

On April 13, 2010, Mr. Wellington submitted a supplemental report which relied on the air quality and mold sample testing performed by Safeco's expert, reading and Internet research conducted by Mr. Wellington, and a 2009 water quality study for the Lake of the Ozarks.

**Legal Standard**

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), aff'd, 528 U.S. 440 (2000). The Rule "favors admissibility if the testimony will assist the trier of fact." Clark ex rel. Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir.

1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted).

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005) (quoting Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995)). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." First Union Nat'l. Bank v. Benham, 423 F.3d 855, 862 (8th Cir. 2005) (citing Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001)).

In Daubert, the United States Supreme Court interpreted Rule 702 to require district courts to be certain that expert evidence based on scientific, technical or other specialized knowledge is "not only relevant, but reliable." Daubert, 509 U.S. at 589. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert at 592-93.

The Eighth Circuit has explained that proposed expert testimony must meet three criteria to be admissible under Rule 702:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . .
>
> The basis for the third prerequisite lies in the recent amendment of Rule 702, which adds the following language to the former rule: '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles

4

and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.' Fed. R. Evid. 702.

Lauzon, 270 F.3d at 686 (internal citations and punctuation omitted).

The Daubert decision lists several nonexclusive factors a court may examine in performing its "gatekeeper" role of screening expert testimony for relevance and reliability. These are: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted." Lauzon, 270 F.3d at 686-87 (internal citations and punctuation omitted). Additional factors which have been developed in subsequent cases include "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." Id. (citations omitted). The Daubert list of factors is not exclusive, and does not function as a definitive "checklist or test." Daubert, 509 U.S. at 593-94. Instead, the trial court retains great flexibility in customizing the analysis to fit the facts of each case. See Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1083 (8th Cir. 1999).

**Discussion**

Plaintiff seeks to offer Mr. Wellington's testimony as an expert witness on the presence and remediation of mold in the interstitial spaces between the exterior hull and the interior cabin finishes of the Sea Ray. Mr. Wellington has opined that proper method of cleaning and disinfecting mold in the Sea Ray is to disassemble the interior cabin finishes to expose all of the hidden structural members of the boat's frame. Safeco seeks to exclude Mr. Wellington's testimony with respect to the location and source of mold contamination on the Sea Ray, the methodology for remediating

5

mold present on the boat, and the effects of mold exposure on plaintiff's health. Safeco asserts that Mr. Wellington's testimony should be excluded because (1) Mr. Wellington is not qualified to offer opinion testimony in this case; (2) plaintiff has failed to establish the bases of Mr. Wellington's opinions on mold identification and remediation; (3) Mr. Wellington is not qualified to testify concerning the effects of mold on plaintiff's health; and (4) Mr. Wellington's testimony will not assist the trier of fact because he did not conduct any testing to verify the presence of mold.

The Court notes that because Mr. Wellington's opinions are largely based on his personal experience and training, the traditional Daubert factors addressing professional studies and scientific knowledge are not necessarily implicated. The Daubert factors do not necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in some cases, the reliability inquiry will instead focus upon personal knowledge and experience of the expert. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999).

1. Adequacy of Expert Report

As a preliminary matter, Safeco complains that Mr. Wellington's expert report does not comply with the requirements of Rule 26 because it consists of a letter to plaintiff's counsel with an attached summary of opinions, the summary is not signed by Mr. Wellington and does not (1) provide the scientific or technical support for Mr. Wellington's opinions, (2) provide basic information concerning Mr. Wellington's qualifications, or (3) list his testimony and publications as required by the Rule. Although Safeco complains of these omissions, it does not expressly move for exclusion of Mr. Wellington's testimony on this basis, and does not cite any legal authority for its exclusion on this basis.

6

Plaintiff responds that Mr. Wellington signed the cover page to which his report is attached, plaintiff provided Safeco with Mr. Wellington's *curriculum vitae* which includes a list of his publications, and a letter from plaintiff's counsel to Safeco's counsel which accompanied Mr. Wellington's report disclosed his prior testimony. Plaintiff asserts that if Safeco had concerns about Mr. Wellington's report it should have notified plaintiff's counsel of the perceived omission, requested supplementation under Rule 26(e) and, if needed, filed a motion to compel, rather than attempting to attack the report on hypertechnical grounds as part of its Daubert motion. Safeco did not revisit the issue of perceived deficiencies in Mr. Wellington's report in its reply memorandum.

The Court finds that plaintiff substantially complied with Rule 26(a)(2)(B) with respect to Mr. Wellington's report and, to the extent he did not, Safeco should have raised the issue much sooner, in the manner suggested by plaintiff. The Court will not address this point further.

2. Witness Qualifications

Safeco moves to exclude Mr. Wellington's testimony on the basis that he has no formal education in any hard science, much less environmental science or microbiology,[2] admits he is self-taught and has learned about mold contamination primarily through reading, and has only some training in mold remediation through a commercial laboratory, Micron, Inc.

Plaintiff responds that no degree is required to provide expert testimony, as Federal Rule of Evidence 702 provides that a witness may qualify as an expert by "knowledge, skill, experience, training or education." Plaintiff states that Mr. Wellington is qualified to testify in this case because he is a certified mold inspector and is certified in mold, allergens, sampling and data interpretation, has published on mold remediation, has done research and has commercial training in mold

---

[2]Safeco concedes that Mr. Wellington has bachelor's and Master's degrees in business.

remediation, has over ten years experience doing mold inspections, has designed mold remediation programs, and has a certification in environmental remediation. Plaintiff states that Mr. Wellington testified he spends approximately sixty percent of his time working in relation to mold, and he and his company perform work for large institutional clients such as Boeing, Monsanto and area hospitals including SSM and BJC. Mr. Wellington testified he is currently authoring two texts for SSM on a "mold control program to be used internally for their maintenance and facility staffs" and that he and his company perform mold remediation work for some of these large institutional clients. Plaintiff relies on Cincinnati Insurance Co. v. Bluewood, Inc., 560 F.3d 798, 807-08 (8th Cir. 2009), another case involving a Daubert challenge to a mold remediation expert, in which the Eighth Circuit affirmed the district court's decision to admit the testimony of the expert based on his certifications and practical experience, although he had not attended college.[3]

Safeco replies that the mere fact Mr. Wellington has been able to sell commercial services on mold inspection and remediation does not make him qualified to render scientific opinions.

The Court finds that Mr. Wellington is sufficiently qualified to offer an expert opinion in this case on mold inspection and remediation, based on the training, knowledge and experience he has in these areas as set forth in his *curriculum vitae* and described above. The fact that Mr. Wellington does not have a college degree in a hard science is not determinative of his qualifications. See Cincinnati Insurance, 560 F.3d at 808.

---

[3]The mold expert in Cincinnati Insurance testified about his knowledge, skill, experience and training in the relevant fields, stating he had received advanced training in methods of "applied structural drying," held certifications from the Institute of Inspection, Cleaning and Restoration and the Indoor Air Quality Association, participated in between 1,500 and 2,000 water remediation jobs over the past 15 years, and regularly performed experimental testing related to mold growth and prevention.

3. Reliability of Opinions

Safeco next argues that Mr. Wellington's opinions are not based on any reliable scientific testing or data, as he concluded plaintiff's boat had mold contamination merely because it "smelled moldy." Safeco states that Mr. Wellington did not conduct any testing or investigation to establish the presence, location or quantities of mold on the boat, or to support his opinion that mold has colonized the interstitial spaces between the hull and the interior cabin finishes of the Sea Ray, although Mr. Wellington testified that swab testing could have been used to verify the presence of mold. Safeco states that Mr. Wellington testified there was a "high probability" of mold present in the interstitial space, but did not testify to the presence of mold with the required reasonable degree of scientific certainty, and intends to testify about the presence of mold and its effect on air quality but did not conduct any air quality testing.

Plaintiff responds that Mr. Wellington's opinions are based on facts contained in the Lake Ozark Environmental report, the Finnegan valuation report, and the Missouri State Water Patrol accident investigation report, types of reports on which experts in his field would reasonably rely. Plaintiff argues that Safeco's attempt to discredit Mr. Wellington's opinion that the Sea Ray smelled moldy lacks credibility, because it is uncontested the Sea Ray is contaminated with mold. Plaintiff cites the report of Safeco's expert, Mr. Narconis, which showed levels of airborne mold in the Sea Ray ranging between 530 and 1250 times that of the outdoor air.

Plaintiff asserts that Mr. Wellington's testimony there is a "high probability" of mold in the interstitial spaces meets the requirements of Rule 702, and is properly based on the Narconis expert report and the Lake Ozark Environmental report. Plaintiff states that Mr. Narconis testified lake water soaked through into the Sea Ray's interstitial spaces, and recommended remediation including

9

forcing dry air into those spaces and then spraying them with fungicide. Plaintiff also states that Mr. Narconis's report indicates (1) he sampled water from a seam in the interior hull and found that water contained a "high level" of mold growth, (2) the source of water in the hull was "condensation from damp materials in the boat ran to the lower portions of the boat and pooled," and (3) residual damp materials from the accident were a likely source of the water he sampled in the hull.

Plaintiff contends that based on the foregoing points, "Safeco's expert agrees that the source of the water and the mold in the boat is at least partially from the accident, that water infiltrated the interstitial spaces, and that the boat contains mold levels exceeding by over 1,000 times the mold found in the outdoor air." Pl.'s Mem. Opp. at 7. Plaintiff asserts it is incredible for Safeco to argue that Mr. Wellington's conclusions are not reasonable and reliable when Safeco's own expert would support many of the same conclusions.

Safeco replies that Mr. Wellington prepared his initial report concluding the Sea Ray was contaminated with mold even though he had not conducted any scientific testing to support that conclusion, and he only inspected the boat once, *after* he had opined that mold on the boat was the result of the 2003 accident. Safeco states that even when Mr. Wellington did inspect the Sea Ray, he testified he did so "basically to understand the skeleton of the boat" and did not look for water damage or conduct any testing to verify the presence of mold.

Although Safeco does not dispute that mold is present on the Sea Ray, it argues that Mr. Wellington cannot rely on Safeco's expert's report as a basis for his own opinions, because Mr. Narconis did not attempt to identify the mold's source, and did not conduct testing within the interstitial spaces. Rather, Safeco contends that Mr. Narconis testified, to a reasonable degree of scientific certainty, that any water in the hull was the result of "condensation from damp materials

10

in the boat [which] ran to the lower portions of the boat and pooled." He also identified several potential sources of mold contamination, including the removal of moldy carpet and the placement of a large canvas cover in the forward berth of the Sea Ray. Safeco argues that Mr. Wellington's supplemental report simply extrapolates from Mr. Narconis's test results to conclude that mold exists in the interstitial spaces, and that the mold in the cabin in 2010 is caused by water that was in the hull in 2003. Safeco argues these conclusions are conjecture, not scientific opinion.

Conclusory opinions by designated experts lack the requisite evidentiary reliability mandated by Rule 702 because they fail to set forth a discernable methodology. Neither Daubert nor the Federal Rules of Evidence "requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). The determinative issue here is whether a sufficient factual basis exists to support Mr. Wellington's opinions that (1) there is mold in the interstitial spaces between the Sea Ray's interior cabin finishes and its hull, and (2) the mold in the interstitial spaces was caused by the 2003 accident.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Bonner, 259 F.3d at 929-30 (quoting Hose, 70 F.3d at 974) (internal citations and quotations omitted). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Id. (quoting Hose, 70 F.3d at 974).

The Court finds that there is sufficient evidence to render plaintiff's expert's opinions admissible. Mr. Wellington testified that he relied on the Lake Ozark Environmental report to

11

establish the presence of mold. While that report documents the existence of some mold in the Sea Ray, it does not establish the presence of mold in the Sea Ray's interstitial spaces. The Lake Ozark Environmental report states that tape-lift samples were taken from three surfaces in the Sea Ray: a refrigerator tray in the galley, a vinyl stool in the galley, and a mirror in the forward cabin. The refrigerator tray showed heavy presence of mold, which is not surprising but seems irrelevant to the issue of mold contamination in the boat in general, while the vinyl stool and mirror showed light presence of mold. Lake Ozark Environmental did not perform any invasive testing such as in the interstitial spaces, and did not state that mold was present in those spaces. (See Ex. 1 to Def.'s Mot. to Limit or Exclude Expert Testimony). Thus, the Lake Ozark Environmental report cannot provide a factual basis for the conclusion that mold is present behind the interior finishes of the cabin.

Mr. Wellington relied on the Missouri State Water Patrol's accident report for evidence that the Sea Ray's hull was breached "resulting in significant water damage to the interior framing of the boat." Wellington letter of Jan. 10, 2010. The fact that the hull was breached and water was inside the boat's cabin in 2003 for an extended period does provide factual support for the opinion that there is mold present in the Sea Ray's interstitial spaces, particularly when Safeco's expert's report is considered, as discussed below.

Mr. Wellington's report also cites the Finnegan valuation report for the fact that "some interior finishes are *tacked carpet, screwed or nailed boards*." (See Wellington initial report at 1). From this, Mr. Wellington concluded that the "skeleton frame of the [Sea Ray's] cabin is partially constructed with a wood framing" and that

> a large amount of water entering the cabin from the accident in 2003 would cause the wood framing members to become wet. Since the accident occurred in August (normally hot and high humidity in Missouri) the wetted wood framing structures behind the cabin finishes would provide the nutrient for any settled mold. Once the

> exposed wood is wet it becomes a settling point for mold--since the wood is a nutrient for mold the wet wood along with the right temperatures (August) provide a perfect environment for mold colonization and expansion. The mold will continue to be present on the wood.

(Wellington Report at 1). The Wellington report summary concludes, "The interior flooding in the Sea Ray caused by the Collision . . . in 2003 likely caused significantly greater damage than what can be seen during a visual inspection of the cabin spaces." It is true that Mr. Wellington did not conduct testing to determine the existence or extent of mold in the interstitial spaces, or remove any portion of the interior cabin finish to observe the interstitial area. He may, however, rely on his experience and training with respect to mold to extrapolate from the fact that the Sea Ray's hull was pierced and the boat flooded with water that interior wood surfaces became wet and would provide conditions conducive to the growth of mold.

Mr. Wellington also submitted a supplemental expert report based on the report of Safeco's expert, Mr. Narconis, a review of books, articles and Internet research, and a 2009 water quality report for the Lake of the Ozarks. An expert may rely on the reliable opinions of another expert in forming his own opinions. See Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments ("The term 'data' is intended to encompass the reliable opinions of other experts.").

Mr. Narconis took air samples in the Sea Ray which showed high levels of mold present in the boat, but he did not test the air in the interstitial spaces or otherwise establish the source of the mold. Mr. Narconis also noted water in a small indentation along the interior left side of the boat, beneath the center cabin seat cushions, which is one of the lowest points in the hull structure, where gravity would likely cause any water on the boat to pool. This water was sampled and showed high levels of mold.

Mr. Narconis's report included the following findings and opinions:

1. A water intrusion in the Sea Ray wetted interior organic materials of the boat for a sufficient time for mold spores to germinate in the boat's interior and to grow exponentially over time. (Narconis Report at 3).

2. If organic materials are allowed to be wet for extended periods of time, mold germination will begin. (Id.)

3. Mr. Narconis opined, to a reasonable degree of scientific certainty,

> that the subject boat was not properly dried in a sufficiently short period of time to prevent significant mold growth amplification, thus causing the subsequent levels of mold amplification. It appears that the liquid water was merely drained from the boat after the accident. However, it does not appear that the boat was ever adequately dried to prevent mold amplification.

(Id. at 4).

4. Mr. Narconis further opined,

> It is my opinion that the remaining "damp" boat materials, after the drainage of the liquid water, caused the [Relative Humidity] in the boat to "spike" after it was placed in the repair shed. Without immediate and aggressive efforts to dehumidify the interior of the cabin, and with the subsequent covering of the boat, the localized evaporation of damp interior materials would have trapped moisture and caused all interior contends to be dampened by the trapped water vapor. These conditions, over extended periods of time, would have assuredly caused rampant mold growth. The boat's interior should have been ventilated and dehumidified (dried) as soon as possible after the liquid water intrusion. Timely dehumidification and ventilation of the boat would have prevented the current level of mold growth. It is important to note that ambient regional summer humidity may have also entered the boat's interior when the hull (hole) was "open."

(Id.)

5. Mr. Narconis disagreed with Mr. Wellington's opinion that the boat must be disassembled in order to dry the interstitial spaces, but stated, "It is my belief that these materials may still be wet, even today. However, sufficient injection of dry air into the boat's interior will dry them. Although some interstitial spaces are difficult to access, they are not airtight." (Narconis Report at 5). Mr.

Narconis subsequently testified that a fog fungicide could be successfully used to treat any mold in the interstitial spaces, because

> You have to think about how the liquid got in there in the first place. The lake water -- the lake water was not aerosolized in a spray. The lake water went in as a liquid which soaked through into the interstitial spaces. What I'm saying is we're spraying this in order to get through any openings, nooks, and crannies, but it will also wet the same area by the same mechanism that the lake water wetted the interior interstitial spaces of the boat. It will put a wet surface on the wood and the other material in there, and it will ostensibly go to the same place that the water went to before. This is water with a chemical in it.

(Narconis Dep. at 122).

6. Mr. Narconis opined that wooden material in the interstitial spaces was probably treated or coated with water resistant material, because "[i]t would be naive to expect that interior spaces of a boat would never get wet. Boats do not usually take on flooding but are often exposed to extremely damp conditions (from high humidity on bodies of water) and hot temperatures. Both of these environmental conditions are ideal for the promotion of mold growth." (Id. at 6).

7. Mr. Narconis opined that "presence of liquid water in the hull seam may be the result of condensation from trapped water, since the boat has been under cover and no rain could enter and, since the boat has never been properly dried." (Id. at 7). Mr. Narconis later prepared a Declaration which stated in pertinent part, "Because the boat was covered and closed, it is my opinion that the moisture I noted in the hull of the boat could be trapped residual moisture from the 2003 accident, but there is no testing available to verify that." Narconis Decl. at 2, ¶ 8.

Mr. Wellington's opinion that mold is growing in the interstitial spaces of the Sea Ray is based in part on the undisputed facts that the hull was breached and significant amounts of water entered into the boat and remained there for an extended period of time, wetting organic (i.e., wooden) portions of the boat's frame during a time of high heat and humidity and creating

15

conditions conducive to the growth of mold. The opinion is supported by Mr. Narconis's opinion that the boat was never properly dried, as opposed to being merely drained of water, which caused "the subsequent levels of amplification" of mold growth. Mr. Narconis also observed that the interstitial spaces are not airtight and opined they may still be wet from the 2003 accident, which lends support to Mr. Wellington's opinion that mold is growing there, as both experts agree wet organic materials are an ideal environment for mold growth.

Mr. Wellington's opinion that the mold in the Sea Ray's interstitial spaces is a result of the 2003 accident is also sufficiently supported by the facts, because the boat was flooded for an extended period and then was covered, trapping moisture inside under conditions favorable for mold growth. The opinion is supported by the opinions of Safeco's expert, who stated that (1) he believed interior portions of the boat may still be wet from the 2003 accident, though there were no tests available to confirm this, and (2) once the boat was covered following drainage of the liquid water after the accident, remaining damp materials inside caused the relative humidity in the boat's interior to increase; and localized evaporation of the damp interior materials would have trapped moisture and caused all interior contents to be dampened by the trapped water vapor, causing rampant mold growth.

The fact that Mr. Wellington did not conduct his own testing of the air or surfaces inside the Sea Ray does not render his opinions inadmissible, as he may rely on testing conducted by Mr. Narconis. Further, Mr. Wellington may reasonably extrapolate from the undisputed facts as discussed above that mold is present in the Sea Ray's interstitial spaces, although no testing of those spaces was done and Mr. Narconis did not testify that mold was present in those spaces. Safeco's

16

arguments concerning the claimed lack of factual basis for Mr. Wellington's opinions are matters for cross examination.

In conclusion, the Court finds Mr. Wellington's opinions, that mold is (1) present in the interstitial spaces of the Sea Ray's hull and (2) is a result of the 2003 accident, are sufficiently reliable and relevant to assist the jury's determination of a disputed issue. See Daubert, 509 U.S. at 594-95. As a result, Mr. Wellington will be permitted to testify about these opinions.

4. Health Effects on Plaintiff of Exposure to Mold

Safeco moves to exclude Mr. Wellington's testimony that plaintiff's complaints of headache and dizziness are caused by the presence of mold on the Sea Ray, because Mr. Wellington has no training, education or experience that allows him to offer an opinion on this issue.

Plaintiff responds that he is not seeking damages for personal injury and will merely testify that his headaches and dizziness are further evidence of the presence of mold on the boat. Plaintiff states Mr. Wellington may testify, as supported by published literature and the testimony of Mr. Narconis, that a certain percentage of the population is sensitive to mold and may experience adverse health effects as a result of exposure and, as a result, it is important to fully eradicate the mold when employing remediation methods. Neither Safeco's motion nor its reply memorandum address the propriety of Mr. Wellington's testimony on mold as a general cause of certain health effects in some people.

Based on plaintiff's statement that Mr. Wellington will not testify plaintiff's headaches and dizziness are related to the presence of mold on the boat, the Court need not address this aspect of Safeco's motion and will deny it as moot. There is no motion currently before the Court to exclude

Mr. Wellington's proposed testimony that some individuals are sensitive to mold and may experience adverse health effects as a result of exposure.

**Conclusion**

For the foregoing reasons, Safeco's motion to motion to limit or exclude the testimony of plaintiff's expert witness, Thomas P. Wellington, should be denied with respect to Mr. Wellington's opinion testimony concerning the presence and cause of mold in the Sea Ray, and denied as moot with respect to testimony concerning the cause of plaintiff's headaches and dizziness.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Safeco Insurance Company of America's motion to limit or exclude the testimony of plaintiff's expert witness, Thomas P. Wellington, is **DENIED** in part and **DENIED** in part as moot; said motion is **DENIED** to the extent that Mr. Wellington will be permitted to testify that (1) there is mold in the interstitial spaces between the interior cabin finishes and the hull of plaintiff's Sea Ray boat, and (2) the mold is the result of the 2003 accident; and **DENIED as moot** to the extent the motion concerns Mr. Wellington's testimony that plaintiff's headaches and dizziness are caused by mold, as no such testimony will be offered. [Doc. 26]

                                                CHARLES A. SHAW
                                                UNITED STATES DISTRICT JUDGE

Dated this   23rd   day of August, 2010.